UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | 1:21-cr-00003-JMS-DML |
| *vs.* | ) | |
| | ) | |
| JARED MASHBURN, | ) | -01 |
| | ) | |
| *Defendant.* | ) | |

**<u>ORDER</u>**

Defendant Jared Mashburn has been charged by Superseding Indictment in this case with two counts of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1), two counts of possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), and two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  [Filing No. 53.]  Presently pending before the Court is Mr. Mashburn's Motion to Suppress Evidence Derived From Defendant's December 16, 2020, Oral Interrogation.  [Filing No. 89.]  The Court held a hearing on the motion on April 11, 2022 and took the motion under advisement.  [Filing No. 110.]  This Order discusses the Court's ruling.

**I.**
**BACKGROUND**

**A.     Mr. Mashburn's December 14, 2020 Arrest by Indiana State Police**

On December 14, 2020 at approximately 2:00 p.m., Mr. Mashburn was taken into custody by Indiana State Police ("ISP") SWAT officers while he was parked at a gas station in Indianapolis, Indiana and was detained on an outstanding warrant out of Putnam County, Indiana.  [Filing No. 94-1 at 4-5.]  Mr. Mashburn was not advised of his rights during his arrest, and FBI Task Force Officer ("TFO") Dan Madison, who was on the scene, told Mr. Mashburn that he was not being

advised of his rights at that time because "a detective [would] be coming to talk to [him]." [Filing No. 90-2 at 1.]   TFO Madison had been investigating Mr. Mashburn for allegedly dealing methamphetamine since September 2020, when he received information from an undisclosed source about Mr. Mashburn.   [Filing No. 90-1 at 4.]   TFO Madison also learned of the Putnam County warrant early on in his investigation.  [Filing No. 90-1 at 4.]

During a search incident to the arrest, ISP officers found a loaded Glock pistol in Mr. Mashburn's waistband, a loaded Taurus revolver in an ankle holster that Mr. Mashburn was wearing, approximately 22 grams of methamphetamine in Mr. Mashburn's shirt pocket, and approximately $12,000 in Mr. Mashburn's wallet. [Filing No. 94-2 at 1-2.] At approximately 2:45 p.m., Mr. Mashburn was transported to the Marion County Jail where he was picked up by Putnam County officials and transported to the Putnam County Jail. [Filing No. 94-2 at 2.]

At approximately 6:11 p.m. on December 14, 2020, law enforcement obtained a search warrant for Mr. Mashburn's residence on Holt Road in Indianapolis.   [Filing No. 94-1 at 5.] Officers executed the warrant around 7:30 p.m. that evening and found, among other things, approximately 39 firearms, approximately 275 grams of actual methamphetamine, digital scales, a vacuum sealer, a drug ledger, and other drug paraphernalia.  [Filing No. 94-1 at 5-8.]

### B.   December 15, 2020 Federal Complaint and Transfer to Federal Custody

On December 15, 2020, Magistrate Judge Paul Cherry signed a Complaint in this case charging Mr. Mashburn with being a felon in possession of a firearm or ammunition in violation of 18 U.S.C. § 922(g)(1).  [Filing No. 2.]  A corresponding arrest warrant was issued.  [Filing No. 3.]  The following day, Mr. Mashburn was transferred to federal custody and transported to the Marion County Jail.  [Filing No. 94-1 at 8.]

## II.
### HEARING TESTIMONY

The central focus of Mr. Mashburn's Motion to Suppress is a pre-*Miranda* conversation that took place between Mr. Mashburn on the one hand, and TFO Madison and Master Trooper ("M/Trp.") Larry Antic on the other, during Mr. Mashburn's transport from the Putnam County Jail to the Marion County Jail on December 16, 2020 to face the federal charges. The parties presented evidence regarding this conversation at the April 11, 2022 hearing, and the Court summarizes that evidence below.[1]

### A.      M/Trp. Antic

The Government called M/Trp. Antic as a witness. He testified as follows:

TFO Madison asked for M/Trp. Antic's assistance in transporting Mr. Mashburn from the Putnam County Jail to the Marion County Jail, and he sat in the rear passenger's seat of an ISP pickup truck while TFO Madison drove and Mr. Mashburn sat in the front passenger's seat. Only those three individuals were present in the pickup truck. The three had general conversation once they got into the pickup truck. TFO Madison explained to Mr. Mashburn that there was a federal arrest warrant, which made Mr. Mashburn become a little uneasy. M/Trp. Antic believed that Mr. Mashburn got a little emotional, started sniffling, and his eyes became glossy.

Neither M/Trp. Antic nor TFO Madison asked Mr. Mashburn about the federal drug investigation, but Mr. Mashburn volunteered that he had some information he thought they would be interested in. TFO Madison stopped Mr. Mashburn, explained to him that they did not want names, but told him to think about what he was going to tell them and that they would like it to be

---

[1] This description of the testimony presented at the April 11, 2022 hearing does not constitute findings of fact, but is merely a recitation of the testimony. The Court's actual findings of fact, which reflect its judgment regarding the credibility of the testimony presented, are below in the "Findings of Fact" section of this Order.

something substantial versus "a small dealer."  TFO Madison told Mr. Mashburn to stop talking because they were going to wait and conduct an interview once FBI Special Agent Kelly Stewart was present and so that Mr. Mashburn could be read his *Miranda* warnings and give a recorded statement.  M/Trp. Antic and TFO Madison advised Mr. Mashburn that he would be transported to the Marion County Jail and would be held until his initial hearing and then would be held in federal custody.  TFO Madison did not ask Mr. Mashburn any questions and TFO Madison did not mention anything about Mr. Mashburn's wife, nor did Mr. Mashburn ask about his wife.  Mr. Mashburn discussed the whereabouts of his Harley-Davidson motorcycles.  Neither M/Trp. Antic nor TFO Madison made any promises to Mr. Mashburn, and they did not read him his *Miranda* warnings or record the conversation because he was not being interrogated or interviewed at that point.

After picking Mr. Mashburn up at the Putnam County Jail, the three stopped at a gas station at the Sam Jones Expressway and I-465 to purchase a pack of cigarettes for Mr. Mashburn.  They then stopped at the VFW Post at I-465 and Holt Road to meet up with Special Agent Stewart.  Agent Stewart then entered the pickup truck and M/Trp. Antic exited the pickup truck and waited inside Special Agent Stewart's car while TFO Madison and Special Agent Stewart conducted the recorded interview with Mr. Mashburn.

**B.    TFO Madison**

Mr. Mashburn called TFO Madison as a witness, and he testified as follows:

As soon as TFO Madison pulled out of the parking bay at the Putnam County Jail in the ISP pickup truck with Mr. Mashburn in the front passenger's seat and M/Trp. Antic in the back passenger's seat, Mr. Mashburn asked to speak to whoever was in charge of the investigation.  TFO Madison stated that he was in charge of the investigation, and Mr. Mashburn said that he had

information that he wanted to give the officers.  TFO Madison was not expecting that, but told Mr. Mashburn okay and explained the federal process, including what would happen once he got to the Marion County Jail.  Mr. Mashburn got emotional, started crying, and told TFO Madison again that he had information, and TFO Madison told Mr. Mashburn to think about what he was going to say.  TFO Madison then made phone calls to the Assistant United States Attorney in charge of the case and to Special Agent Stewart.

Mr. Mashburn brought up his Harley-Davidson motorcycles and expressed concern about them.  He also talked about his father-in-law who was in the military and other general conversation.  TFO Madison did not make any promises to Mr. Mashburn while transporting him from the Putnam County Jail to the Marion County Jail and before meeting up with Special Agent Stewart.  Additionally, he did not have any substantive conversations with Mr. Mashburn before meeting up with Special Agent Stewart.  Prior to the recorded statement, TFO Madison did not tell Special Agent Stewart about any conversations TFO Madison had had with Mr. Mashburn.

### C.   Mr. Mashburn

Mr. Mashburn testified as follows at the evidentiary hearing:

Mr. Mashburn used approximately a gram of methamphetamine daily leading up to his arrest on December 14, 2020.  He used methamphetamine the day before his arrest and may have used methamphetamine early in the morning on December 14, 2020.   Despite his methamphetamine use, he has a "pretty good" memory and can remember a lot of things very clearly even when he is high.  He had been arrested before his arrest in this case, and is familiar with the process of being interviewed by law enforcement.

When Mr. Mashburn got into the pickup truck with TFO Madison and M/Trp. Antic to be transported from the Putnam County Jail to the Marion County Jail, he asked TFO Madison what

he was being charged with.  TFO Madison did not give a specific answer, but said gun and drug charges.  He had general conversation with TFO Madison and M/Trp. Antic, but M/Trp. Antic was mainly silent.  Mr. Mashburn and TFO Madison started talking about Mr. Mashburn's situation and TFO Madison asked Mr. Mashburn about the items that were found in his house and asked what was going on with all of the guns in his house.  TFO Madison also mentioned that drugs had been seized from Mr. Mashburn's house.  Mr. Mashburn would ask the officers a question and then TFO Madison would respond and ask him a question.  TFO Madison asked Mr. Mashburn where the drugs came from, but Mr. Mashburn did not answer.  He also asked Mr. Mashburn whether he knew anything about theft rings and crime around the area and Mr. Mashburn said he should probably talk to a lawyer.  TFO Madison told him that if he lawyered up then everybody was going to get into a pissing match and all bets were off.  Mr. Mashburn was mainly concerned with his wife and kept asking if she was okay, where she was, and what was going on with her as she had been arrested also.  He became emotional because he was worried about his wife and her safety, given everything that was going on.  At that point, he had no idea where his wife was.

Mr. Mashburn and TFO Madison then started talking about Mr. Mashburn's cooperation. TFO Madison said that there are only two types of inmates in the federal system: inmates who cooperated and inmates who wished they had.  They then started talking about Mr. Mashburn's Harley-Davidson motorcycles, his seized vehicle and the vehicle his wife was driving when she was arrested, the titles to the vehicles, his house, his dog, and other property.  Mr. Mashburn was conducting a "fishing expedition" to try to get information on what was going on.  When Mr. Mashburn brought up his wife, TFO Madison told him that it would be in his best interest and in his wife's best interest if he took responsibility for the items recovered during the search of his home.

- 6 -

Mr. Mashburn then told TFO Madison and M/Trp. Antic that all of the guns in his house were his and that there was seven pounds of methamphetamine in his house.  He did not just "blurt" this information out.  TFO Madison looked a little shocked because the officers who had searched Mr. Mashburn's house had not discovered the seven pounds of methamphetamine.  TFO Madison then began making calls to the Assistant United States Attorney and to Special Agent Stewart because he wanted to go back into Mr. Mashburn's house to retrieve the seven pounds of methamphetamine.  Mr. Mashburn again told TFO Madison that he was worried about his wife's safety and his family's safety because the drugs did not belong to Mr. Mashburn and he was worried about retaliation by the owner of the drugs.  TFO Madison said that he could put Mr. Mashburn's wife into witness protection if Mr. Mashburn became an informant, that TFO Madison could get her an apartment and a job, and that if Mr. Mashburn cooperated it would help the situation.  Mr. Mashburn continued providing information, and TFO Madison said that he would personally return to Mr. Mashburn's wife the money and cell phone that she had on her the day that she was arrested.  TFO Madison also told Mr. Mashburn that he would release the vehicles that had been seized, along with the title to the vehicles, to Mr. Mashburn's father-in-law.  Mr. Mashburn and TFO Madison basically reached an agreement that if Mr. Mashburn took responsibility for everything that was in his house, his wife would be left out of it.  Mr. Mashburn would not have talked to the officers if he did not have other people to worry about, but he would have signed any paper in the world to save his wife and family.  The only promise TFO Madison made regarding Mr. Mashburn's release was that he was not going to go home that day.  Mr. Mashburn was under the impression that he was supposed to be helping TFO Madison.

TFO Madison, M/Trp. Antic, and Mr. Mashburn then stopped at a gas station on the west side of Indianapolis to buy Mr. Mashburn a pack of cigarettes.  They then drove to a parking lot

near the gas station and Mr. Mashburn got out of the pickup truck and M/Trp. Antic stood next to him while they made small talk.  Mr. Mashburn tried to explain to M/Trp. Antic that he was not as bad as the situation made him look and he again expressed concern for his wife.

All parties agree that once Special Agent Stewart joined the group, he gave a *Miranda* warning, and recorded the conversation with Mr. Mashburn thereafter.

## III.
### FINDINGS OF FACT[2]

### A.    Mr. Mashburn's Pre-*Miranda* Statements

The following findings of fact relate to what transpired during the transport of Mr. Mashburn from the Putnam County Jail to the Marion County Jail and before he was read his *Miranda* warnings.  They are gleaned from the evidence presented at the April 11, 2022 hearing and summarized above, and the parties' filings.  The Court's findings reflect the old adage: "There are two sides to every story and the truth usually lies somewhere in the middle."  They are not wholly consistent with any one witness's testimony, and the Court has only credited testimony that it finds to be the most believable.  Additionally, to the extent that a witness's hearing testimony was inconsistent with filings in this case, the Court does not credit that testimony.  The Court reviewed the docket in this case and relied on certain filings in making its findings.

Mr. Mashburn was a daily user of methamphetamine until his arrest on December 14, 2020, possibly using methamphetamine in the early morning hours the day of his arrest.  Mr. Mashburn also had been arrested several times before, and was familiar with the process of being questioned by law enforcement.

---

[2] Any finding of fact should be deemed a conclusion of law to the extent necessary, and vice versa.

On December 16, 2020, TFO Madison and M/Trp. Antic picked Mr. Mashburn up from the Putnam County Jail in an ISP pickup truck, with TFO Madison driving, Mr. Mashburn in the front passenger's seat, and M/Trp. Antic in the rear passenger's seat.  Mr. Mashburn initiated the conversation regarding his charges and engaged in a "fishing expedition" to obtain information regarding those charges and any charges against his wife by asking numerous questions.  Mr. Mashburn asked who was in charge of the investigation, TFO Madison stated that he was, and Mr. Mashburn advised that he had some information he thought the officers would be interested in.  Their discussions went beyond general conversation, and did not end immediately with TFO Madison cutting Mr. Mashburn off.[3]  At this point, Mr. Mashburn knew what was going on with his wife and where she was because he mentioned in his recorded, post-*Miranda* interview that she was also being detained at the Putnam County Jail and that he had seen her there.[4]

The conversation was a give-and-take of information, with TFO Madison on the one hand providing Mr. Mashburn with information regarding the charges against him and general advice about the federal system, and Mr. Mashburn on the other providing TFO Madison with information regarding the seven pounds of methamphetamine that law enforcement had missed during the search of his house, and potentially other information regarding his drug-related activity.  During

---

[3] In its response to Mr. Mashburn's Motion to Suppress, the Government stated that if the Court held a hearing on the motion, it "expect[ed] to establish" that during the transport from the Putnam County Jail to the Marion County Jail, "TFO Madison and M/Trp. Antic declined to speak with [Mr.] Mashburn about his case at that time and limited their comments to explaining the charge against him and the federal process (e.g., that he would be transferred to U.S. Marshal custody)," and that "[Mr.] Mashburn began to volunteer information regarding the offense, but TFO Madison cut off [Mr.] Mashburn."  [Filing No. 94 at 1-3.]  The Court finds that the Government did not establish those facts at the April 11, 2022 hearing or otherwise.

[4] This is contrary to Mr. Mashburn's testimony at the April 11, 2022 hearing that he had no idea where his wife was when he was being transported from the Putnam County Jail to the Marion County Jail.  The Court does not find Mr. Mashburn's hearing testimony concerning Mr. Mashburn's wife truthful.

this give-and-take, TFO Madison was asking Mr. Mashburn questions and Mr. Mashburn was asking TFO Madison questions as would occur during a normal conversation.  TFO Madison did not promise Mr. Mashburn anything specific in exchange for information, although Mr. Mashburn was hopeful  that by sharing information he would receive more favorable treatment.  He volunteered this incriminating information in an effort to persuade law enforcement of his honesty, and to curry favor.

During Mr. Mashburn's transport from the Putnam County Jail to the Marion County Jail and before receiving his *Miranda* warnings, Mr. Mashburn did not ask for an attorney or state that he thought he needed to speak to an attorney.[5]

### B.    Mr. Mashburn's Post-*Miranda* Statements

Mr. Mashburn submitted a flash drive containing almost two hours of recorded statements that he gave to Special Agent Stewart and TFO Madison after he was read his *Miranda* warnings, and a subsequent almost fourteen-minute recorded statement that he gave to TFO Madison and M/Trp. Antic regarding another case.  [Filing No. 90-6.][6]  The Court makes the following findings of fact from the recordings.

TFO Madison, M/Trp. Antic, and Mr. Mashburn met up with Special Agent Stewart in a parking lot near the Indianapolis International Airport.[7]  Mr. Mashburn was read his *Miranda*

---

[5] Mr. Mashburn testified at the April 11, 2022 hearing that while speaking with TFO Madison and M/Trp. Antic during his transport from the Putnam County Jail to the Marion County Jail and before he was read his *Miranda* warnings, he stated that he thought he needed to speak to an attorney.  However, he did not mention this in his Declaration in support of his Motion to Suppress or in his brief in support of the motion.  The Court finds Mr. Mashburn's testimony at the April 11, 2022 hearing that he had stated that he thought he needed to speak to an attorney to be untruthful.

[6] The Court *sua sponte* **ORDERS** the Clerk to place the flash drive filed at Dkt. 91 **UNDER SEAL**.

[7] The testimony regarding the locations of the stops TFO Madison, M/Trp. Antic, and Mr. Mashburn made on the way to the Marion County Jail, including where TFO Madison, M/Trp. Antic, and Mr. Mashburn met up with Special Agent Stewart and where they were parked when

warnings and acknowledged that he had not been promised anything in exchange for providing information.  Mr. Mashburn expressed a desire to help his wife by providing information, and TFO Madison told him "like I told you, there's no promises" regarding helping his wife because she was not in federal custody and did not have any federal charges pending against her.  TFO Madison told Mr. Mashburn that, like he had told him before, TFO Madison has a pretty good relationship with the Putnam County Prosecutors' Office and could try to work with them to help Mr. Mashburn's wife and was "pretty confident we can work something out."  Mr. Mashburn told TFO Madison that he had briefly seen his wife at the Putnam County Jail and had told her that he would do everything he could to get her out.

---

Mr. Mashburn received his *Miranda* warnings and gave his recorded statement, is somewhat confusing.  Mr. Mashburn has filed a Petition for Judicial Notice of Supplemental Evidence Pursuant to Federal Rule of Evidence 201, in which he asks the Court to take judicial notice of five "facts" related to those locations.  [Filing No. 112.]  The Government objects to the Court taking judicial notice of two of those facts.  [Filing No. 116.]  The Court does not find these locations particularly significant to the issues at hand, but defers to the Final Incident Report for its findings regarding the location of Mr. Mashburn's recorded statement, which specifies that he was read his *Miranda* warnings in a parking lot near the Indianapolis International Airport.  [Filing No. 90-1 at 8.]  This is consistent with Mr. Mashburn's testimony at the April 11, 2022 hearing and with the Advice of Rights, which indicates that it was signed at "5726 West Professional, Indpls. IN," [Filing No. 90-7].  It is inconsistent with the testimony of TFO Madison and M/Trp. Antic, who both stated at the April 11, 2022 hearing that Mr. Mashburn was read his *Miranda* warnings, signed his *Miranda* waiver, and gave his recorded statement at a VFW post near Mr. Mashburn's house.  Again, however, the location where Mr. Mashburn and the officers met up with Special Agent Stewart and where Mr. Mashburn was read his *Miranda* warnings, signed the waiver, and gave his recorded statement is of no significance to the Court's decision.  In any event, the fact that the location is "on the west side of Indianapolis, just north of Sam Jones Expressway and just east of Interstate 465, less than one mile from the boundary of the Indianapolis International Airport" is subject to judicial notice.  Accordingly, the Court **GRANTS IN PART** Mr. Mashburn's Petition, [Filing No. 112], to the extent that it takes judicial notice of that fact.  The Court **DENIES IN PART** Mr. Mashburn's Petition, [Filing No. 112], as to the remaining facts for which Mr. Mashburn requests judicial notice, since those facts either re-cap a witness's testimony or state what a document on the docket in this case says – neither of which are appropriate subjects of judicial notice.

TFO Madison explained to Mr. Mashburn that he would not be getting out of custody that day no matter what information Mr. Mashburn told them, and that if they had to go to a house to retrieve anything, Mr. Mashburn would not be able to go in.  TFO Madison suggested that Mr. Mashburn help himself and tell TFO Madison and Special Agent Stewart "where x amount of pounds of meth are and how we gotta get it."  Mr. Mashburn proceeded to tell TFO Madison and Special Agent Stewart where the seven pounds of methamphetamine that law enforcement had missed during the search of his house was located and to provide other information regarding the methamphetamine.  Mr. Mashburn expressed concern regarding whether he would be charged with possessing the additional seven pounds of methamphetamine since he was telling officers about it, and Special Agent Stewart said that to charge Mr. Mashburn with the additional seven pounds of methamphetamine would be "a dick move" and that Special Agent Stewart wasn't into "dick moves."

Mr. Mashburn smoked some cigarettes in the parking lot near the gas station where they had been parked.  Then they all went to a VFW parking lot near Mr. Mashburn's house.  Mr. Mashburn was moved to Special Agent Stewart's car and TFO Madison and M/Trp. Antic got into the pickup truck and drove to an alley near Mr. Mashburn's house and across the street from the VFW.  TFO Madison then contacted various individuals, including Assistant United States Attorney Kendra Klump and Mr. Mashburn's landlord, to facilitate the recovery of the methamphetamine.

Mr. Mashburn suggested that they bring his wife to the same location so that the two could provide information together, and TFO Madison stated that he was pretty confident that Mr. Mashburn's wife would be out of jail by the time Mr. Mashburn was able to get bond.  TFO Madison explained some differences between the state and federal systems and told Mr. Mashburn

that when he is in federal custody, "everyone is listening…; everybody is listening to everything that you're saying."

Mr. Mashburn provided additional information regarding his activities and then asked TFO Madison and Special Agent Stewart if there was a way to make sure that his Harley Davidson motorcycles and other items in his house were safe.  Mr. Mashburn stated that his wife was scheduled to appear in court on Tuesday and suggested that maybe the officers could get her out before then.

Law enforcement was eventually able to enter Mr. Mashburn's house and retrieve the additional seven pounds of methamphetamine that had been missed in the initial search.  Special Agent Stewart told Mr. Mashburn he appreciated the information and said it went a long way in showing that Mr. Mashburn was being honest.  TFO Madison told Mr. Mashburn, "I can't explain how much you're helping yourself right now, cause the federal system is, like I told you, it's very big on taking responsibility for your actions."  He also told Mr. Mashburn, "the more you do, the better it is."

Mr. Mashburn was eventually permitted to contact a family member to remove items from the house and put them in storage.  The recorded interview stopped, and Special Agent Stewart left.  TFO Madison and M/Trp. Antic then conducted a separate, approximately fourteen-minute recorded interview of Mr. Mashburn in which they discussed information related to another case.

## IV.
### CONCLUSIONS OF LAW

Mr. Mashburn raises two primary arguments in support of his Motion to Suppress: (1) that statements, and any evidence derived from those statements, obtained from Mr. Mashburn more than six hours after his arrest but before his initial appearance must be suppressed unless the Court finds that the delay in presentment for an initial appearance was reasonable; and (2) that the delay

in presenting him for his initial appearance was not reasonable, so his statements must be suppressed because they were not voluntary. [Filing No. 90 at 5-14.] The Government argues in response that Mr. Mashburn's Motion to Suppress is untimely and also addresses the merits of Mr. Mashburn's arguments. The Court will address the parties' arguments in turn, beginning with the timeliness issue.

### A. Timeliness

The Government argues that Mr. Mashburn's Motion to Suppress is untimely because the Court set a deadline of thirty days after counsel entered an appearance for Mr. Mashburn in which to file a motion to suppress. [Filing No. 94 at 4 (citing Filing No. 25 at 11; Filing No. 28).] The Government notes that Mr. Mashburn's counsel entered an appearance on January 13, 2021, and the Motion to Suppress was filed on January 26, 2022. [Filing No. 94 at 4.] It asserts that because the Motion to Suppress is untimely, Mr. Mashburn must show good cause for his failure to file the motion in a timely manner, and he has not done so. [Filing No. 94 at 4-5.]

Mr. Mashburn did not address timeliness in his opening brief, [*see* Filing No. 90], and did not file a reply brief.[8]

Federal Rule of Criminal Procedure 12(c)(1) provides that the "court may…set a deadline for the parties to make pretrial motions," such as a motion to suppress under Rule 12(b)(3). "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely," though the "court may consider the…request if the party shows good cause." Fed. R. Cr. P. 12(c)(3); *see also United States v. McMillian*, 786 F.3d 630, 635-36 (7th Cir. 2015) ("Before a

---

[8] "Failure to respond to an argument…results in waiver," *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010), and the Court could deny Mr. Mashburn's Motion to Suppress solely because he has waived any arguments in opposition to those set forth by the Government in its response. Nevertheless, the Court will address the merits of those arguments.

court may consider an untimely motion to suppress, a defendant must first establish good cause for the absence of a pretrial motion.") (quotation and citation omitted).  Indeed, an untimely motion does not even preserve an issue for appellate review unless the movant can make the good cause showing.  *United States v. Adame*, 827 F.3d 637, 647 (7th Cir. 2016).

> The Court's January 12, 2021 Order unequivocally states:
>
> IT IS FURTHER ORDERED that all MOTIONS (including motions to suppress evidence)…shall be filed within thirty (30) days after either the appearance by counsel for the defendant or the notice given by the defendant of the assertion of the right of self-representation.

[Filing No. 25 at 11.]  Mr. Mashburn's counsel entered his appearance on January 13, 2021, [Filing No. 28], and the Motion to Suppress was filed on January 26, 2022, [Filing No. 89].

Mr. Mashburn has offered no explanation for why his motion seeking the suppression of all evidence derived from his statements on December 16, 2020 was filed nearly one year after the deadline set by the Court.  The Court therefore **DENIES** Mr. Mashburn's Motion to Suppress due to a lack of good cause under Rule 12(c)(3), but will alternatively consider the merits of Mr. Mashburn's motion in the interest of a resolution on the merits.

### B.  Statements More Than Six Hours After Arrest and Before Initial Appearance

Mr. Mashburn argues in support of his Motion to Suppress that he made incriminating statements on December 16, 2020, which was more than six hours after his arrest on federal charges.  [Filing No. 90 at 5-6.]  Specifically, he asserts that he was arrested for a federal offense on December 14, 2020 at approximately 2:00 p.m. because TFO Madison, who was "nominally an officer of the [ISP]," was assigned to the FBI's Joint Task Force, identified himself as an FBI Task Force Officer in the affidavit supporting the request for a search warrant for Mr. Mashburn's residence, was "cross-deputized" as a federal officer, and the methamphetamine recovered from Mr. Mashburn's residence was turned over to a federal agent.  [Filing No. 90 at 6-7.]  Mr. Mashburn

asserts that when he was arrested, TFO Madison "knew [Mr.] Mashburn was guilty of being a Felon in Possession of a Firearm or Ammunition, and this is the exact charge for which [TFO] Madison sought a federal arrest warrant the following day." [Filing No. 90 at 7-8] (emphasis omitted).] Mr. Mashburn argues that he also was being held on federal charges, in addition to state charges, on December 15, 2020 because "the Putnam County court reinstated [his] bond on the Putnam County case" and "[i]f he was being held solely on state charges, he would have been released from custody once Putnam County reinstated his bond." [Filing No. 90 at 8] (emphasis omitted).]

In its response, the Government argues that the undisputed facts show that Mr. Mashburn's statements were made well within a six-hour window of his federal arrest, which was on December 16, 2020 at approximately 1:00 p.m. [Filing No. 94 at 5-6.] It notes that the incriminating statements were made between the time he was released from Putnam County custody on December 16, 2020 at 1:00 p.m. and the time he was dropped off at the Marion County Jail at 5:30 p.m. that same day – less than five hours after his federal arrest. [Filing No. 94 at 6.] The Government argues that the fact that TFO Madison also served on a federal task force is irrelevant, and that it is undisputed that Mr. Mashburn was arrested on the Putnam County warrant on December 14, 2020, and not on federal charges. [Filing No. 94 at 6-7.] It also argues that TFO Madison's knowledge regarding which crimes Mr. Mashburn may or may not have committed "does not dictate the authority" that he had when arresting Mr. Mashburn. [Filing No. 94 at 7.] The Government notes that if Mr. Mashburn had been in federal custody on December 14, 2020, he could not have appeared before the Putnam County court on that day, as he did. [Filing No. 94 at 7.]

Mr. Mashburn did not file a reply brief.

Mr. Mashburn relies upon 18 U.S.C. § 3501(c), which provides that:

In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention:  Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c) (emphasis omitted).

As the United States Supreme Court has explained, under § 3501(c):

[A] district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]").  If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and…the weight to be given [it] is left to the jury."  If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary…, and if it was, the confession is to be suppressed.

*Corley v. United States*, 556 U.S. 303, 322 (2009).

Applying the principles of *Corley*, the Court first considers whether Mr. Mashburn's statements were made within six hours of his arrest.  If so, those statements are admissible as long as they were made voluntarily.  Mr. Mashburn's argument that he was really arrested on federal charges on December 14, 2020 because TFO Madison is also on an FBI task force while serving as an ISP officer and because TFO Madison knew Mr. Mashburn had committed federal crimes is unsupported by any caselaw to which Mr. Mashburn has pointed the Court, or of which the Court

is aware.  To the contrary, the undisputed facts show that Mr. Mashburn was arrested on the Putnam County warrant and held on that warrant until December 16, 2020 at 12:55 p.m., when TFO Madison and M/Trp. Antic took custody of Mr. Mashburn to transport him to the Marion County Jail.  Indeed, the federal warrant was not even issued until December 15, 2020, so Mr. Mashburn could not have been held on federal charges until he was taken into federal custody on that warrant – which took place on December 16, 2020 at approximately 1:00 p.m.

It is also undisputed that Mr. Mashburn made the statements which are the focus of his Motion to Suppress on December 16, 2020 before he was booked into the Marion County Jail. That took place at approximately 5:30 p.m. on December 16, 2020 – less than five hours after he was taken into federal custody.

The Court rejects Mr. Mashburn's argument that he made his incriminating statements more than six hours after his arrest on federal charges, and that his statements are inadmissible for that reason.  Accordingly, his recorded statements are admissible, provided they were made voluntarily.  That issue is discussed below.[9]

---

[9] Because Mr. Mashburn's recorded statements were made within the six-hour window after his arrest on federal charges, the Court need not determine whether Mr. Mashburn was presented for his initial appearance within a reasonable timeframe for purposes of § 3501(c).  The Court notes, however, that Mr. Mashburn was arrested on federal charges the afternoon of December 16, 2020 – a Wednesday – and was brought to the Marion County Jail after business hours.  His initial appearance took place the following Tuesday, December 22, 2020.  This was during a time when, due to the Covid-19 pandemic, the Court was authorized to hold initial appearances by video.  *See* General Order in *In re Authorization of Video and Telephone Conferencing Pursuant to the Coronavirus Aid, Relief, and Economic Security Act* (S.D. Ind. Dec. 16, 2020).  The Court does not find the passing of three full business days between Mr. Mashburn's arrest on federal charges and his initial appearance – December 17, 18, and 21 – in order to facilitate the video conference to be unreasonable.  Additionally, the statements which are the subject of Mr. Mashburn's Motion to Suppress took place before Mr. Mashburn could have been presented for his initial appearance in any event, because he had not yet been returned to this District.

C.     **Admissibility of Post-*Miranda* Recorded Statements in Light of Pre-*Miranda* Statements**

Mr. Mashburn argues in support of his Motion to Suppress that he did not make his incriminating statements voluntarily.  [Filing No. 90 at 11-12.]  He argues that TFO Madison used the delay in his initial appearance to psychologically coerce him into confessing to protect his wife, stating that "[r]ather than interrogating [Mr.] Mashburn immediately after his arrest, [TFO] Madison intentionally declined to advise [Mr.] Mashburn of his rights, and intentionally sent [Mr.] Mashburn to Putnam County, so that when [TFO] Madison finally had [Mr.] Mashburn in the car, on the way back to Indianapolis, [Mr.] Mashburn had been forced to speculate and worry about his wife for nearly two days."  [Filing No. 90 at 12.]  Mr. Mashburn argues that "[a]s a result of the 40 hour 'sweating period,' [his] oral statement cannot be viewed as voluntary."  [Filing No. 90 at 12.]  Mr. Mashburn also argues that he made the statements before being read his *Miranda* warnings, stating that "[TFO] Madison and [M/Trp.] Antic began interrogating [him] almost immediately after [he] was picked up at the Putnam County Jail," and "[n]either officer advised [him] of his *Miranda* rights before the interrogation began."  [Filing No. 90 at 13.]  He asserts that because he initially made the statements while en route to Marion County and before being read his *Miranda* warnings, both his recorded statements (which he contends contain the same information) and the "six (or 7.5) pounds" of methamphetamine seized from the second search of his residence are inadmissible as "fruit of the poisonous tree."  [Filing No. 90 at 13-14.]

In its response, the Government argues that Mr. Mashburn's confession was voluntary because he was not questioned before waiving his *Miranda* rights, and that Mr. Mashburn's claim that he was interrogated during the trip from Putnam County to Marion County is false.  [Filing No. 94 at 9.]  The Government asserts that Mr. Mashburn attempted to speak to law enforcement during the trip from Putnam County to Marion County, but that law enforcement told him to stop

speaking, they met up with Special Agent Stewart, Mr. Mashburn was read his *Miranda* warnings, and Mr. Mashburn then provided information to the officers.  [Filing No. 94 at 9.]   The Government contends that the only evidence of Mr. Mashburn's alleged confession during the trip from Putnam County to Marion County and before he was read his *Miranda* warnings "is the affidavit provided by [Mr. Mashburn], which is not credible and not supported by the record." [Filing No. 94 at 10.]  It also argues that even if Mr. Mashburn had spoken to law enforcement before his post-*Miranda*, recorded statements, that would not render the recorded statements inadmissible.  [Filing No. 94 at 10.]  The Government also asserts that Mr. Mashburn's interview was free of coercion or any other indication that it was involuntary.  [Filing No. 94 at 10.]  It argues that the Court should consider Mr. Mashburn's age, intelligence, education, and familiarity with the criminal justice system and that all of these factors indicate that Mr. Mashburn's statements were voluntary.  [Filing No. 94 at 11.]  It notes that Mr. Mashburn was 38 years old at the time of his arrest and has extensive experience with the criminal justice system, including 19 charged criminal cases, 12 of which were felonies.  [Filing No. 94 at 11.]  The Government also contends that Mr. Mashburn's argument that the interrogation tactic of conducting an interview two days after his arrest is somehow a coercive tactic is unsupported by law, and that the recorded interview indicates that officers did not promise Mr. Mashburn that his wife would be released if he confessed.  [Filing No. 94 at 11-12.]

Mr. Mashburn did not file a reply brief.

To implicate *Miranda*, the defendant must be: (1) in custody; and (2) subject to interrogation.  *See, e.g.*, *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016).  "A person is in custody for *Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest."  *Id.* (internal quotations and citations

omitted).   The parties do not dispute that Mr. Mashburn was in custody when he gave the statements that he seeks to suppress.   The focus of their disagreement is whether Mr. Mashburn's statements to TFO Madison and M/Trp. Antic while en route from the Putnam County Jail to the Marion County Jail, and before Mr. Mashburn received his *Miranda* warnings, make his post-*Miranda* recorded statements inadmissible.

Where a defendant gives a pre-*Miranda* statement that is voluntary, "subsequent statements made after *Miranda* warnings are provided are admissible." *United States v. Ambrose*, 668 F.3d 943, 955 (7th Cir. 2012) (citing *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011) and *United States v. Swanson*, 635 F.3d 995, 1004 (7th Cir. 2011)).   Where, however, the earlier pre-*Miranda* statements are involuntary, "then later statements provided after *Miranda* warnings are admissible only if there is a sufficient break in the stream of events to insulate the second confession from the earlier taint." *Ambrose*, 668 F.3d at 955.

The Court will first consider whether Mr. Mashburn was subject to interrogation when he was being transported from the Putnam County Jail to the Marion County Jail and before he had been given his *Miranda* warnings.   Then it considers whether, if he was being interrogated, Mr. Mashburn's statements were voluntary.

>    1.    *Whether Mr. Mashburn's Pre-*Miranda* Statements Were the Result of an Interrogation*

The test for determining whether an interaction constitutes an interrogation is "whether a reasonable objective observer would have believed that the law enforcement officer's statements to the defendant were reasonably likely to elicit an incriminating response." *United States v. Swanson*, 635 F.3d at 1002 (internal quotations and citations omitted).   "[V]oluntary incriminating statements are not subject to *Miranda* warnings and are admissible as evidence." *Id.* at 1001-02 (citations omitted).

As discussed above, the Court has found that the pre-*Miranda* conversation between Mr. Mashburn on the one hand and TFO Madison and M/Trp. Antic on the other was more than Mr. Mashburn volunteering information and the officers immediately cutting him off.  Instead, the Court finds that a back-and-forth exchange took place where Mr. Mashburn initiated the conversation and both he and TFO Madison were asking each other questions and providing each other with information.  The Court finds that TFO Madison's questions to Mr. Mashburn – which included questions regarding the guns and drugs that were found at his house and, eventually, questions regarding the additional seven pounds of methamphetamine that law enforcement officers had missed during their initial search – were reasonably likely to elicit an incriminating response and constituted an interrogation.  The Court goes on to consider whether Mr. Mashburn's pre-*Miranda* statements were voluntary.

   2.   *Whether Mr. Mashburn's Pre-*Miranda *Statements Were Voluntary*

"A confession is involuntary when it was given in circumstances that were sufficient to overbear the confessor's free will." *Johnson v. Pollard*, 559 F.3d 746, 753 (7th Cir. 2009) (citing *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); *see also Weidner v. Thieret*, 866 F.2d 958, 963 (7th Cir. 1989) ("Interrogation becomes constitutionally objectionable only when the circumstances prevent the person being questioned from making a rational choice.").  "The test for voluntariness asks, 'Is the confession the product of an essentially free and unconstrained choice by its maker?'" *Lentz v. Kennedy*, 967 F.3d 675, 691 (7th Cir. 2020) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).  The Court looks to the totality of the circumstances surrounding a confession to determine whether it is voluntary and determines whether those circumstances would have interfered with the "free and deliberate choice of whether to confess." *Johnson*, 559 F.3d at 753. It also considers "both the characteristics of the accused and the details of the interrogation."

*Schneckloth*, 412 U.S. at 226.   "Among the factors to be considered is whether the defendant initiated contact with law enforcement."   *United States v. Higgins-Vogt*, 911 F.3d 814, 821 (7th Cir. 2018).

At the April 11, 2022 hearing, Mr. Mashburn's counsel asked him:  "Did you voluntarily tell them that you were going to – that you had some information that you wanted to give them?"  Mr. Mashburn answered "No. Not, not like that.  No.  I didn't just blurt it out.  No."  While Mr. Mashburn likely did not "blurt out" the fact that law enforcement had missed the seven pounds of methamphetamine in his house, TFO Madison also did not drag this information out of Mr. Mashburn.  Mr. Mashburn was fishing for information from TFO Madison and vice versa.  It is significant that Mr. Mashburn initiated the conversation by telling TFO Madison that he had some information that he thought the officers would be interested in.  Further, Mr. Mashburn has been arrested numerous times and is familiar with the criminal justice system.  He repeatedly indicated that he wanted to provide information in hopes that it would help his wife or him.[10]

---

[10] To the extent that Mr. Mashburn is arguing the TFO Madison and M/Trp. Antic lied to him or misled him by promising that Mr. Mashburn's statements would have a positive effect on his wife's case, the Court rejects that argument.  There is no evidence that the officers made explicit promises to Mr. Mashburn – indeed, they told him they were not making promises and Mr. Mashburn acknowledged that he had not been promised anything at the beginning of his first recorded statement.  Further, in any event, the Seventh Circuit has "repeatedly held that a law-enforcement agent may actively mislead a defendant in order to obtain a confession, so long as a rational decision remains possible," and misleading a defendant does not render the confession involuntary.  *United States v. Sturdivant*, 796 F.3d 690, 697 (7th Cir. 2015); *see also United States v. Villalpando*, 588 F.3d 1124, 1128-29 (7th Cir. 2009) (detective's statement that she would "sit down" with law enforcement to "work this out" and that "we don't have to charge you" did not make confession involuntary); *United States v. Rutledge*, 900 F.2d 1127, 1128-31 (7th Cir. 1990) (denying motion to suppress confession where officer told suspect that "his cooperation would be helpful," since "the law permits the police to pressure and cajole, conceal material facts, and actively mislead – all up to limits not exceeded here").  Even if TFO Madison and/or M/Trp. Antic had misled Mr. Mashburn, this would not warrant the suppression of Mr. Mashburn's statements under the circumstances presented.

Finally, and perhaps most significantly, Mr. Mashburn argued earlier in this case – when it suited his purpose – that his statements to TFO Madison and M/Trp. Antic during his transport from the Putnam County Jail to the Marion County Jail on December 16, 2020 were voluntary. First, in his Motion to Modify Detention Order, Mr. Mashburn argued that "[t]hroughout the trip [from Putnam County to Marion County] [he] voluntarily provided [TFO] Madison with information, including the location of seven pounds of methamphetamine[] that had not been discovered during the search of [his] residence." [Filing No. 34 at 3 (emphasis omitted).] In his Declaration supporting that motion, he stated: "After my appearance in Putnam County, I was transported back to the Marion County Jail by [TFO Madison].  Throughout the trip, I voluntarily provided [TFO] Madison with information, including the location of seven pounds of methamphetamines that had not been discovered during the search of my residence." [Filing No. 34-6 at 2 (emphasis omitted).]  Mr. Mashburn set forth this same argument in his Second Motion to Modify Detention Order, [Filing No. 45 at 5], and made the same statement regarding the voluntary nature of his statements in another Declaration filed in support of his Second Motion to Modify Detention Order, [Filing No. 46-6 at 3].  Mr. Mashburn's story has changed depending on his motivation.  He touted the voluntary nature of his statements when trying to convince the Court to modify the terms of his detention, but he now claims – in an effort to suppress evidence – that his pre-*Miranda* statements were not voluntary and taint his later, post-*Miranda* statements.  Mr. Mashburn cannot have it both ways, and he is bound by his earlier representations to the Court that

his pre-*Miranda* statements during his transport from the Putnam County Jail to the Marion County Jail were voluntary.[11]  In any event, the Court finds them to be so.

In sum, while the Court finds that Mr. Mashburn was subject to interrogation while he was being transported from the Putnam County Jail to the Marion County Jail and before he was read his *Miranda* warnings, it also finds that the statements Mr. Mashburn made during that timeframe were voluntary.  Accordingly, those statements do not taint his post-*Miranda* recorded statements and the recorded statements and the additional methamphetamine recovered as a result of those statements will be admissible at trial.  His Motion to Suppress Evidence Derived From Defendant's December 16, 2020, Oral Interrogation is **DENIED**.  [Filing No. 89.]

## V.
### CONCLUSION

For the foregoing reasons:

- Mr. Mashburn's Petition for Judicial Notice of Supplementary Evidence Pursuant to Federal Rule of Evidence 201, [112], is **GRANTED IN PART** to the extent that the Court takes judicial notice of the fact that the location where TFO Madison, M/Trp. Antic, and Mr. Mashburn met up with Special Agent Stewart, and Mr. Mashburn received his Miranda warnings, signed his Advice of Rights, and gave his recorded statements "is located on the west side of Indianapolis, just north of Sam Jones Expressway and just east of Interstate 465, less than one mile from the boundary of the Indianapolis International Airport." Mr. Mashburn's Petition, [112], is **DENIED IN PART** in all other respects;

- Mr. Mashburn's Motion to Suppress Evidence Derived From Defendant's December 16, 2020, Oral Interrogation, [89], is **DENIED**.  Mr. Mashburn's December 16, 2020 recorded statements and the evidence derived from those statements will be admissible at trial; and

---

[11] Additionally, the Court rejects the notion suggested by Mr. Mashburn that a delay in bringing him before the Magistrate Judge coerced him into confessing.  Mr. Mashburn made his statements shortly after his federal arrest, and before he would have even known when his initial appearance would be.  The sequence of events simply does not support the notion that Mr. Mashburn felt coerced into making the statements because he had a long time to think about his predicament before his initial appearance.

- The Court **ORDERS** the Clerk to place the flash drive filed at Dkt. 91 **UNDER SEAL**.

Date: 4/22/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

- 26 -